relationship to and consistency with his job classification. Because the work assignments don't, plaintiff has never been properly and legally evaluated on his performance appraisals. SEC management has been recalcitrant in repeatedly refusing to write a position description that accurately describes what plaintiff actually does or to assign work consistent with his current position description. As a result, plaintiff has never received a legally proper performance appraisal.

Because defendant styles plaintiff's simple factual recitals as claims, defendant has manufactured a bizarre theory that describes plaintiff as impermissibly splitting or duplicating a single cause of action. The absurdity of this argument is demonstrated by the fact that the student loan denial had not even occurred at the time plaintiff filed his 2002 lawsuit.

Defendant also seems to be arguing that Plaintiff's proper course would have been to amend the 2002 lawsuit to throw in his claim over the 2003 student loan program. Worse still, at various times, Defendant hurls a litany of preposterous accusations against Plaintiff, stating that Koch is suing "multiple times on a single claim", "splitting into separate suits based on different grounds for the same relief", and is "splitting into separate actions involving the same subject matter."

Plaintiff disputes defendant's assertion that plaintiff is subjecting the Court to duplicative and repetitive complaints; it is Defendant Cox, rather, who is wasting this Court's precious time by making this argument.

Koch's 2002 complaint says nothing about the denial of Koch's 2003 application to participate in the student loan reimbursement program. Indeed, it could not.

Koch's 2002 complaint has multiple claims, but none relating to the 2003 student loan reimbursement application.

The only claim in the instant case relates to the SEC's rejection of Koch's participation in the student loan program. As noted, paragraphs six through eleven are simply recitals of facts essential to refuting defendant's defense.

To the extent that there are underlying facts in common might which lead to ultimate resolution of the various and separate claims in the two lawsuits, such underlying facts (such as improper work assignments during a particular period leading to improper evaluations) *might* foreclose resolution of the identical issue in the later suit, on grounds of collateral estoppel or issue preclusion. This is not the same as *res judicata*, however.

In the instant case, the SEC's official, Frank J. Donaty, Jr., said he made the decision based, at least in part, on Koch's evaluations over either the period from 1998 through 2002, or a ten year period ending in 2002—it is not clear which. Some of these evaluations might be relevant to the 2002 suit—but not all.[9] The 2002 lawsuit addressed

---

[9] The 2002 suit covered evaluations up to and including those issued by SEC management in the year 2000. As a result, there would be at least two years of evaluations (2001 and 2002), which would not be the subject of the 2002 suit. Despite any similarity regarding these two yearly evaluations and those that comprise the subject matter of the 2002 suit, they are discrete time periods. It is theoretically possible for the Court to determine that Plaintiff was provided improper evaluations based on illegal work assignments for those two years, yet was not so provided for any or all of the years prior to 2001. In other words, the results could differ between the two lawsuits. Further, it is possible that the issues might not even be controverted and decided in the first suit, so there would be no issue preclusion in the second suit. *See National Savings & Trust Company v. Rosendorf*, 559 F.2d 837, 838-39 (D.C. Cir. 1977). *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 601-02 (1948) ("Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment.")

performance evaluations from 1994 through the year 1999 or 2000. If the period 1998
through 2002 is used as the justification for the student loan denial, there is almost no
overlap with the performance appraisals addressed in the 2002 suit, which covers periods
from 1994 through 1999 or 2000. At most, there appears to be overlap of perhaps a
couple of years. Accordingly, there are evaluation cycles from 2000 (or 2001) through
2002, or two or three separate years, which are not covered by the 2002 litigation.[10]

Even if one argues that the issue of improper work assignments is similar
throughout the period, the two periods, the first, 1994 through 1999, and the second, 2000
through 2003, would have to be analyzed and litigated separately. Work assignments and
performance appraisals for each period would have to be analyzed separately.

Defendant is correct in stating that the doctrine against splitting of claims is a
form of the application of the general doctrine of *res judicata*.

When analyzing Defendant's argument, namely, the application of res judicata to
paragraphs 6-11, and whether dismissal before decision in the earlier case, one finds that
it is devoid of legal analysis and support, and therefore, without merit.

In support of his argument that Plaintiff has stated identical claims, he makes the
following argument: Both lawsuits have the same plaintiff and defendant. Both arise
from the same subject matter—plaintiff's employment at the SEC. The two suits involve
allegations under the same set of laws, and have the same jurisdictional basis. Finally,

---

[10] It is not clear whether Donaty considered evaluations for the year 2003. He appears to
state that he did not, but it was apparently already available to him. If he did, it
strengthens even more plaintiff's contention that two suits involve discrete matters. We
note, moreover, that defendant states in his motion that Donaty only relied on evaluations
from 1998 through 2002, while some of his statements actually suggest he looked back
further, for ten years prior to 2003. These factual discrepancies highlight the need for
discovery.

because there are identical paragraphs in both complaints--so the argument goes-- the causes must involve identical claims.

Defendant, however, totally ignores and fails to cite, controlling case law and other authority necessary to the definition of claim, whether *res judicata* or possible claims preclusion applies, and particularly whether, under *res judicata*, dismissal of certain factual allegations prior to resolution of the earlier suit on its merits is warranted.

The necessary first step in any analysis of claims splitting involves defining what constitutes a claim for purposes of the doctrine of claims splitting, in general, and *res judicata* in general.

The prevailing view of the definition of a claim is embodied in the *Restatement Judgments* (2d) §24.

> §Dimension of "Claim" for Purposes of Merger or Bar— General Rule Concerning "Splitting"
>
> (1)    When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2)    What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as to whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

The *Restatement's* Comments go on to explain the meaning of transactional definition of claim:

25

> The expression 'transaction, or series of connected transactions,' is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim…In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes."

*Restatement Judgments (2d)*, Comment a.

Employing the above standards, Plaintiff concedes that there are facts that might be common to the student loan claim in the instant case and some of the claims in the 2002 litigation. Frank Donaty is a common actor in both cases. His denial of Plaintiff's participation in the student loan reimbursement is a new and discrete action, however, not an element or fact in the 2002 lawsuit. It is true that Plaintiff alleges retaliatory motive by Donaty in various actions which are relevant facts in the 2002 suit, but Plaintiff also asserts that Donaty acted on improper animus related to Plaintiff's continuing post-2000 protected activity. Donaty's animus over Plaintiff's protected activity is also derived from new protected activity not covered in the 2002 lawsuit. Therefore, while there might be overlap of some facts, there is not complete identity of all the facts. Plaintiff must, however, have the right to challenge as discriminatory and retaliatory those evaluations to which Donaty referred as the basis for his decision to deny Plaintiff's nomination, including those covered by the 2002 lawsuit. Plaintiff is not trying to re-litigate or duplicate those allegations, he must have the right to rebut the Defendant's use

26

of those performance allegations as valid and lawful. If those allegations are ultimately fully litigated in the 2002 lawsuit, and the Court makes findings on those performance appraisals, the proper course is for the Court would be to treat the outcome of its disposition on those allegations as issue preclusion or collateral estoppel.[11]

In other words, if the issues are actually controverted and decided on the merits in the 2002 suit, the proper course *might* be for the Court to treat the same issues as decided and precluded in the instant case.[12] It is not mandatory under all circumstances. Dismissal of factual allegations at this step is wholly unwarranted and lacks legal justification. Dismissal will deprive Plaintiff of his right and opportunity to address the issue of pretext with respect to Donaty's decision to deny the recommendation of Koch for the reimbursement program.

The *Restatement's* Commentary supports the view that the 2003 student loan repayment denial is properly a separate action supported by a separate and new set of operative facts.

---

[11] Of course, as previously noted, the necessary requirements for collateral estoppel must be met, i.e., the issues must have actually been controverted and decided on the merits. While such work assignment issues might actually constitute claims in the 2002 lawsuit, as material adverse conditions of employment, Plaintiff is not styling such allegations as separate claims for which he seeks relief in this case. Plaintiff only seeks relief for his denial of a student loan repayment.

[12] As already noted, this could only apply to those work assignments and related performance appraisals covered by the 2002 suit. It is theoretically possible that the Court could find that Koch was assigned improper work and improperly evaluated for different periods and at different times, but perhaps not all periods and times, between 1994 and 2003 (although Plaintiff does not concede that.) Still, each performance appraisal, and each time period, is discrete for purposes of the Court's consideration.

27

Comment f, discussing Change of Circumstances, states that [m]aterial operative facts after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first…even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought."

"A court 'must look to the factual issues to be resolved [in the second cause of action], and compare them with the issues explored in' the first cause of action. *S.E.L. Maduro v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987), *quoted in Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir. 1990)." *Manning v. City of Auburn*, 953 F.2d 1355, 1359 (11th Cir. 1992).

Beyond any doubt, the denial of participation in the student loan repayment program presents sufficient facts not present in the actions complained of in the 2002 to establish a different cause of action or claim.

Further, even if one could argue that the action of the SEC resulting in the 2002 suit and the instant suit involve "essentially the same course of wrongful conduct," this would not be decisive. As the Supreme Court has noted, "Such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action." *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327-28 (1955). Because the conduct complained of in the second suit was all subsequent to the prior judgment, the Court found that the subsequent lawsuit involved a new cause of action. "While the 1943 judgment precludes recovery on claims arising prior to its entry, it

cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.*

The Defendant quotes a number of cases, many quite old, for support of its argument that this case is simply "claim-splitting." A careful review of the various cited cases reveal factual situations much unlike the instant controversy, and therefore, they lend virtually no support to the argument Defendant advances. More recent and more relevant authority, particularly in this Circuit, suggests that the Court should find that all allegations in this case should proceed independently and intact.

Most, if not all, of the cases cited by Defendant involve various scenarios where the plaintiff sought to make out different theories in different lawsuits involving the identical nucleus of operative facts or attempts through second lawsuits to defeat procedural limitations in the initial suit.

Several circuits have carefully considered the issue of claim splitting, particularly in a scenario much like that involved here, where the subsequent claim arose during the pendency of the earlier litigation.

In each case, where the new set of operative facts gave rise to a new claim, the courts stated that plaintiffs were free to pursue the second suit separately, notwithstanding the pendency of a prior lawsuit between the parties. In *Manning*, 963 F.2d at 1360 (11th Cir. 1992), the Eleventh Circuit quoted with approval the decision of the Ninth Circuit in *Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*, 750 F.2d 731, 739 (9th Cir. 1984):

29

[t]he scope of litigation is framed by the complaint at the time it is filed. The rule that a judgment is conclusive as to every matter than might have been litigated 'does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated.

As the *Manning* Court went on to say

Put differently, we do not believe that the *res judicata* preclusion of claims that "could have been brought" in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation…Our decision avoids the "potentially unworkable requirement that every claim arising prior to entry of a final decree must be brought into the pending litigation or lost." *Los Angeles Branch NAACP*, 750 F.2d at 739 n. 9.

*Manning*, 933 F.2d at 1360.

At most, Plaintiff in this instant case could be permitted to file a supplemental pleading under Federal Rule 15(d), which "makes such a pleading optional." *Pleming v. Universal-Rundle Corporation*, 142 F.3d 1354, 1357 (11th Cir. 1998) ("The doctrine of res judicata does not punish a plaintiff for exercising the option not to supplement the pleadings with an after-acquired claim.").

Another court in this circuit addressed the issue of after-acquired claims at length with special consideration to the issue of defining what constitutes a separate cause of action. "[T]he D.C. Circuit has noted that courts, in determining whether acts fall within the same "cause of action", should look to the "timing" these occurrences. The more distant in time, the more likely it is that the claims constitute two causes of action. Second, and far more important, courts have held that claim preclusion does not extend to claims that did not arise until after the original pleading was filed in the earlier litigation." *Does I Through III v. District of Columbia and MRDDA*, 238 F.Supp.2d 212, 219 (D.D.C. 2002).

30

There is no doubt that a nucleus of operative facts arising at least three years after the claims raised in Plaintiff's 2002 lawsuit constitutes a separate claim. Also as noted by the *Does I Through III* court, claim preclusion does not bar this subsequent and separate claim. If the claim is a separate and different claim, there can be no claim-splitting. Current judicial policy, moreover, does not favor compulsory amendment of the 2002 lawuit with the claim in this 2006 lawsuit.

The student loan reimbursement claim is separate from any claim presented in the 2002 lawsuit because it arises from a separate and discrete set of operative facts.

Claims splitting, as a doctrine related to res judicata, is designed to address duplicative litigation and enhance judicial economy. Judicial economy is not served by dismissing certain of the factual allegations upon which Plaintiff relies in the instant case.

Further, judicial economy would not be served by requiring Plaintiff to amend his 2002 complaint to include the new claim involving the student loan program. Discovery is close to completion in the 2002 lawsuit. Donaty, the primary decision-maker in the 2003 personnel action, has already been deposed, but has not been questioned about the issues involving the student loan program. Further, there has been no document discovery relating to Koch's application for the student loan program in 2003. Plaintiff has had no opportunity to ask Donaty to compare Koch's qualifications with those of Kevin Rupert, or to even find out what Donaty knows about Koch's work performance as of 2003 or his legal background and qualifications. Performance appraisals not covered by the 2002 lawsuit, including those occurring in years after 2000, would not have been the subject of discovery.

31

Other Courts have permitted cases to proceed separately in similar situations. In *Velikonja v. Ashcroft*, 355 F.Supp.2d 197 (D.D.C. 2005), the court rejected the government's contention that newly-arisen claims, based on events occurring after the filing of his original complaint, should have been included in the original and still pending lawsuit by "'seeking leave to amend or supplement her pleadings,'" even if the two actions shared "the same nucleus of facts." Id. At 201., *citing Apotex, Inc. v. Food and Drug Admin.*, 393 F.3d 210, 217-18 (D.C. Cir. 2004). [13] The *Velikonja* court further stated that "...*res judicata* 'does not prevent parties from later bringing claims that 'would have been utterly impracticable to join' in an earlier suit,'" *citing Apotex*, 393 F.3d at 218 (*quoting U.S. Indus. V. Blake Construction Co.*, 765 F.2d 195, 205 n.21 (D.C. Cir. 1985)).

Another factor which favors a separate suit is the requirement established by the Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) that discrete acts of discrimination or retaliation require exhaustion separately. Administration exhaustion was not complete in this instant suit until approximately four years after the filing of the 2002 suit. The Restatement recognizes that res judicata should not apply where the statutory scheme contemplates separate lawsuits or where a single litigation is impractical. Restatement Judgments (2d) § 26. Like the *Velikonja* plaintiff, Koch concluded that he needed to exhaust his 2003 claim before filing suit.

---

[13]    *Velikonja* is not the only case where a court in this Circuit has recently held that a single claim may be split. *Wise v. Glickman*, 257 F.Supp.2d 123, 131 (D.D.C. 2003) held that "plaintiff's claim was not barred, although it arose from the same nucleus of facts as claims made in plaintiff's previous suits, because 'any other claims made [during the previous suits] may have been deemed premature' and thus plaintiff 'never had a fair and full opportunity to litigate [those claims]'. *Quoted in Velikonja*, 355 F.Supp.2d at 202.

Accordingly, the Court should decline to dismiss such recitals from Plaintiff's complaint and permit Koch to proceed separately on the new and separate claim raised in this litigation.

## Conclusion

The complaint here adequately alleges employment discrimination and retaliation causes of action. Defendant's narrow Rule 12(b)(6) challenge to the complaint and his Rule 56(c) motion must fail because the complaint substantially alleges the "adverse employment action" element of plaintiff's claims and because defendant has utterly failed to carry its burden as required by Rule 56(c) and under Local Rule LCVR 7.1. Defendant's statement of material facts not in genuine dispute is defective because, inter alia, it fails to set forth material facts with sufficient precision and particularity, and many of the so-called "facts" are really disputed contentions. Further, plaintiff has demonstrated that he is not splitting claims, and is properly before this court on a separate and new lawsuit challenging SEC actions which had not even occurred at the time of the filing of the 2002 lawsuit. For all the foregoing reasons, defendant's motion should be denied at this time, and plaintiff should be allowed to proceed with discovery.

2-12-07
_____
Date

_____
Randolph S. Koch
7701 Woodmont Avenue, Apt. 807
Bethesda, MD 20814
(W) 202-551-6984
(O) 301-656-0645

33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RANDOLPH S. KOCH,<br><br>       **Plaintiff**<br><br>       v.<br><br>**CHRISTOPHER COX,**<br>  Chairman, U.S.Securities<br>  and Exchange Commission,<br><br>       **Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **Civil Action 06-0656 (PLF)** |

**PLAINTIFF'S STATEMENT OF DISPUTES, OBJECTIONS,
AND RESPONSES TO DEFENDANT'S STATEMENT OF
<u>MATERIAL FACTS NOT IN GENUINE DISPUTE</u>**

In support of his motion for summary judgment, defendant has proffered a statement of material facts not in genuine dispute. Although discovery has not even begun, plaintiff can in a rudimentary way dispute, object, and otherwise respond to several of defendant's claimed undisputed material facts, and can identify others that would require discovery to evaluate.

**I.      Objections and Responses to Defendant's Statement of Material Facts Not in
Genuine Dispute**

Several of Defendant's "facts" are objectionable on legal grounds and specific objections are set forth individually below. Plaintiff expressly objects to defendant's alleged undisputed material "facts" 2, 3, 8, 9, 10, 11, 12.

      A.      Defendant's Undisputed Material "Fact" No. 2:

Plaintiff claims to have a history of cardiovascular disease and obstructive sleep apnea.

Plaintiff's response:

Plaintiff has established that he suffers from cardiovascular disease and obstructive sleep apnea. It is not simply a "claim." Plaintiff has provided undisputable medical evidence of both illnesses to Defendant. Defendant's own medical consultant, Neal Presant, M.D., an occupational medical specialist, employed by the Federal Occupational Health Administration, has confirmed that Plaintiff's obstructive sleep apnea is a disability within the meaning of the Rehabilitation Act of 1973.

B.     Defendant's Undisputed Material "Fact" No. 3:

On July 26, 2002, plaintiff filed Koch v. Pitt, Civil No. 02-1492 (D.D.C.) (PLF) which raises the same claims plaintiff has raised in the Complaint in the instant case in paragraphs 6-11.

Plaintiff's Response:

Plaintiff has not raised the same claims in the instant suit. The claim in the instant suit relates to the failure of the SEC to enter Koch into the student loan reimbursement program in 2003. That claim was not even in existence at the time the 2002 suit was filed. Paragraphs 6-11 of the instant complaint are not separate "claims," but are simply facts underlying the alleged basis for Donaty's denial of the student loan nomination, the prior performance appraisals.

C.     Defendant's Undisputed Material "Fact" No. 8:

2

Mr. Donaty declined to recommend plaintiff for participation in the Repayment

Program because Mr. Donaty concluded that he could not certify that plaintiff was

an employee with unique qualifications that met a special agency need or was

likely to leave the SEC if he did not participate in the Program. Moreover, Mr.

Donaty could not certify that plaintiff's retention at the SEC was essential.

Plaintiff's Response:

Plaintiff does possess unique and superior qualifications for someone in the

Disclosure Office. Plaintiff's academic achievements, publication history, and

work experience are superior to most, if not all, of his colleagues in that office.

Donaty, moreover, has almost no knowledge of plaintiff's work product, as he is

not plaintiff's immediate supervisor. (Notwithstanding any assertions the SEC

might make in this regard, plaintiff must have discovery to establish Donaty's

lack of knowledge.) Further, plaintiff's job calls for him to have almost no contact

or interaction with Donaty. Appropriate discovery will establish that plaintiff

does have superior qualifications and makes unique contributions to the agency's

mission, particularly in comparison to others accepted into the repayment

program. Donaty would not be in a position to assess whether Koch's retention

was essential. Further, discovery will establish that Donaty's asserted reasons are

simply pretext for his discrimination and retaliation which are the real reasons for

his refusal to nominate Koch.

D.      Defendant's Undisputed Material "Fact" No. 9:

Mr. Donaty based his decision on plaintiff's performance evaluations from 1998-

2002, during which time plaintiff received four "Fully Successful" ("FS") ratings

3

and one "Unsatisfactory" rating.   In addition, plaintiff had never received a rating

higher than FS during the previous ten years and had received one "minimally

Successful" rating.

Plaintiff's Response:

Plaintiff had indeed received an Exceeds Fully Successful, and was right on the

borderline for an "Outstanding" in 1993.  That was within the previous ten years.

Just before Plaintiff received his 1994 performance rating, plaintiff contacted an

EEO counselor, a fact which was known to management and to Donaty's

superiors.  In fact, the 1994 performance appraisal was clearly illegal under SEC

regulations, because it was performed by a supervisor two levels above Donaty,

and that supervisor, Gladwyn Goins, did not have authority to perform the rating.

After Plaintiff started his protected activity, management assumed the role of

serial retaliators, assigning lower performance appraisals each year, which

resulted in still more responsive EEO complaints to challenge the retaliatory

ratings.  Thus, for each lowered rating, including interim ratings, there was a

responsive EEO complaint, followed by more retaliatory interim and annual

ratings.  This resulted usually in at least two EEO complaints per year over the

next decade.  Further, each year, virtually 100 percent of Plaintiff's work

assignments were outside of the work assignments prescribed by his position

description.  Plaintiff was classified as a financial analyst, yet he was evaluated

illegally on the standards (including those relating to timeliness) to be applied to

attorneys.  In the one year plaintiff received an unsatisfactory rating, it was based

on plaintiff's alleged failure to update a database, not on substantive work

4

assignments, analysis and writing, or any qualities that would relate to plaintiff's attractiveness to an outside legal employer.

E.     Defendant's Undisputed Material "Fact" No. 11:

Even on occasions in which plaintiff received an FS rating, his performance evaluations discussed problems with his performance.

Plaintiff's Response:

This statement of undisputed "fact" is subtlely misleading, because it suggests that by stating that the performance appraisal discussed problems, it suggests that there *were* problems. As previously noted, and as plaintiff can prove after discovery, all such appraisals were the result of discrimination and retaliation, and were illegal to boot.

F.     Defendant's Undisputed Material "Fact" No. 12:

Mr. Donaty did not consider plaintiff's religion, age, alleged disability or past EEO activity when he denied plaintiff's request to participate in the program.

Plaintiff's Response:

Donaty did indeed take into account plaintiff's religion, age, established disabilities, and past EEO activity when he denied plaintiff's request to participate in the program. Plaintiff has, on a number of occasions, heard Donaty make disparaging remarks about current and former SEC employees, and non-employees, all of whom were Jewish. Although he did not specifically mention that they were Jewish, plaintiff reasonably discerned a clear pattern of dislike. In fact, Plaintiff never heard him make any such disparaging remarks about non-Jews. During the most of the time plaintiff has been in the Office of Disclosure,

5

that office, unlike all other offices in the Division, and indeed the Commission, has almost never hired Jews. When the few were hired, they were generally hired by officials other than Donaty. (Koch started to work for Donaty, but was hired by someone else, not Donaty, and it was instead of Donaty's choice.) Only once in the last fifteen years has Donaty hired or promoted a Jew. Donaty also reportedly told an official of the EEO office that Donaty was unhappy that Koch did not reveal his medical condition before he was hired, ostensibly so the SEC would have been on notice not to hire Koch. Donaty, has on occasion, expressed his anger over Koch's EEO activity, including several angry outbursts to Koch himself. He also reportedly stated in a deposition in another case that Koch has filed too many EEO complaints, or words to that effect.

## II.    Material Facts As to Which There is Genuine Dispute

Plaintiff submits that there exist here genuine issues of fact material to the issue of whether plaintiff was discriminated against based on his religion, age, disability or was the victim of retaliation with respect to the 2003 student loan repayment program. Such facts will necessitate discovery and litigation in the instant case. The most significant of these may be stated as follows:

1.    Whether plaintiff was denied participation in the program because he was the victim of anti-Jewish animus. Relevant to this issue and necessitating discovery is the persistent failure of the disclosure office branches under Donaty to hire Jews. Discovery is also necessary with respect to the application of code words ("whiners") to Jewish attorneys represent registrants and whether this disguises animus against Jews.

6

2.      Discovery will also have to focus on the role this played with respect to Donaty's assignment of inordinately heavy workloads to plaintiff when Donaty was his supervisor and such light workloads to the alleged comparator, Kevin Rupert, which resulted in an evaluation system where plaintiff was doomed to fail because of the imbalance.

3.      Whether Donaty failed to accommodate plaintiff for his disability by assigning inordinately heavy workloads to Plaintiff, and by causing a downward spiral in plaintiff's health by contributing to the denial of the opportunity to attend medically-supervised cardiac rehabilitation.

4.      Whether Koch's various supervisors have assigned Koch work outside of that prescribed by his position description, and whether, therefore, Koch was improperly and unfairly evaluated on work illegally and improperly assigned.

5.      Whether Kevin Rupert, throughout much of the period upon which Donaty based his alleged rationale for denying Koch's participation in the program, was favored with an inordinately and disproportionately light workload.

6.      Whether Kevin Rupert attended a law school of the same rigor as Koch, whether he performed as well as Koch in his academic work, and whether he can demonstrate that he has legal work experience of the quality of Koch.

7.      Whether Kevin Rupert can demonstrate that he was likely to leave the agency for a more attractive job in the finance, securities or legal fields. Did Rupert apply for any jobs other than the job he took for a few months in the Health Care Financing Administration?

7

8.    Whether the purported demonstrated "attrition" justifying the student loan repayment program resulted from employees leaving for private sector employment or for jobs in comparable financial agencies (e.g., the FDIC, Federal Reserve Board, Comptroller of the Currency), or non-commerce and non-financial agencies.

9.    Did Koch work a heavier workload than Rupert and, if so, for what periods?

10.   Whether Koch worked on more complex, novel and/or challenging assignments?

11.   Does Koch possess credentials that are more attractive to private sector employers than those possessed by Rupert or the other as of yet unidentified comparators who were granted student loan repayments?  What law schools did the comparators attend, what kind of grades did they receive and did they perform editorial work on scholarly legal journals while in law school?

12.   Whether the Disclosure Office under Donaty has hired Jews in percentages that are significantly below those hired in other securities industry professional work units in the SEC?

13.   Whether the number of people receiving the student loan repayment are disproportionately younger than those not receiving the benefit, and whether there is a more age neutral alternative to enhancing retention and stemming attrition?

Respectfully submitted,


2/12/07
Date

Randolph S. Koch
7701 Woodmont Avenue, Apt. 807
Bethesda, MD 20814
(W) 202-551-6984
(H) 301-656-0645